**MISSOURI PACIFIC R. CO. v. STEEL.**

No. 18332.   Opinion Filed Dec. 17, 1929.

Rehearing Denied Jan. 28, 1930.

Commissioners' Opinion, Division No. 2.

Thos. B. Pryor and W. L. Curtis, for plaintiff in error.

Glenn H. Chappell, for defendant in error.

BENNETT, C. This is an action against Missouri Pacific Railroad Company for damages for personal injuries suffered by plaintiff below, Mrs. J. W. Steel. The parties will be referred to in the same order in which they appeared in the trial court.

Plaintiff's petition alleges that defendant's track runs north and south through Nowata and is intersected by a public highway running east and west near the south limits of said city, at which point there was an artificial grade several feet above the level of the highway; that the highway approaches to, and on each side of, the intersection, were short, abrupt and steep, and that the right of way on each side of the track takes a sharp, steep curve downward and that the crossing was in an unsafe and dangerous condition; that on May 29, 1925, plaintiff and her husband were proceeding along said highway from the east and over said railroad crossing, and that because of the dangerous and unsafe condition thereof, their automobile was thrown from under the control of the driver and caused to turn over, whereby plaintiff suffered serious and permanent injuries to the bones, muscles and ligaments of her back, causing severe and continuous pain since that time, and partial paralysis of the lower extremity; that the plaintiff has incurred obligations for medical and hospital care and attention, etc.

To this petition defendant filed general denial and a plea that J. W. Steel, plaintiff's husband, was guilty of negligence in driving on said crossing, and that the car was not in good mechanical condition, by reason whereof plaintiff's hurt, if any, arose from, or was contributed to by, such negligence.

The cause was tried to a jury which rendered its verdict for plaintiff for $1,800, from which defendant appeals.

Nine grounds for reversal are set up in the motion for new trial. The petition in error contains ten grounds. The argument and brief, however, are confined to four contentions, which we shall consider in their order.

1. The first contention is that the verdict and judgment are contrary to the evidence, contrary to law and not supported thereby, and that the court should have sustained defendant's demurrer to the evidence of the plaintiff at the time plaintiff rested, and that the court should have granted the defendant's request for peremptory instruction to the jury to find for the defendant.

Plaintiff testified, in substance, that she and her husband crossed said intersection at about 8 o'clock in the evening; that it was dark, but the lights of the car were burning; the crossing was just south of the city limits of Nowata; that her husband was driving a Ford touring car and that the speed of same was not over 15 miles per hour; that she and her husband, the only occupants of the car, were on the front seat and the car and tires were in good condition, and had been used for a little over a year; that just as they went over the railroad track, the car bounced and she was thrown

forward out of the seat and over on the arm of her husband, and throwing the steering wheel out of balance; that her husband was using both hands upon the steering wheel at the time and that the impact caused her to bounce forward over and between the steering wheel and the windshield, and this caused her husband to lose control of the car which turned over on the west side of the railroad and on the south side of the intersecting highway. Asked as to her location at the time the car turned over, she said she was between the steering wheel and the windshield and could not get out; that her husband got out and some minutes thereafter people came to their rescue and lifted her out; that they took her out and laid her on the ground; that her back was hurt; her ear was cut and there were many bruises about her body, but the major injuries were in the back; she was taken from this place to the office of Dr. John R. Collins, who gave her first aid; thence she was taken to Nowata Hospital where she stayed until Tuesday or Wednesday afternoon of the next week; that she was under the doctor's care there constantly and from that place she was carried to Tulsa where she was treated by Dr. C. S. Summers and also an osteopath. Dr. F. G. Gard: remained in Tulsa until the 11th of June; thence by rail to Springfield, Mo., and the rest of the way to Bolivar in a Ford: traveled on a sleeper because she could not sit up, and was in bed while on the train, and thereafter was constantly under the care of physicians for about four months. Was not able to sit up all day until sometime in December following the injury, and has not been fully able to attend to household duties since that time; confined to her bed about eight weeks; that this condition was due to the injury received at the time of turning over of the car; that she is not now able to do all of her household tasks; that before the accident she was feeling well and doing her household duties without difficulty; that she had theretofore had the care of doctors, but not for a year prior to the injury; that she is 55 years old; that she has suffered more or less constantly from the injury to the back; that this was her first trip over the road to Nowata.

Several neighbors testified that before the injury complained of, plaintiff was able to do her household work and appeared to be in good health, but that afterwards she was not able to do her work or to undergo any considerable exertion without very great fatigue.

Dr. M. E. Guthrie testified that he was a graduate of a recognized school of ostepaths and had been practicing since 1912. Upon examination of plaintiff found that the spine was badly injured; the tenth and eleventh and twelfth dorsal vertebrae were twisted to the right and posterior. The first, second and third lumbar below that were twisted to the left and anterior. There was considerable discoloration of tissues, the ligaments badly strained, and partial paralysis of the lower extremity. The patient was unable to arise without help and the neck muscles and tissues were much congested; that plaintiff was not able to sit up at all. There was discoloration on both sides of the backbone in the lumbar region at and near the place of the twisted vertebrae; and a small injury over one of the eyes. At the time of trial plaintiff is able to do part of her work at home, but is not able to walk any great distance; that plaintiff was able to get up and walk around the room about the middle of September. The injury complained of will be more or less permanent. The paralysis cleared up in September following the injury, but the trouble from the twisted vertebrae would tend to increase and is more pronounced at the date of trial than it was six months prior.

Mr. C. T. Babb; lives at Nowata, county surveyor since statehood; was familiar with the crossing; the ground came up tolerably level until just before it entered the railroad, and then it went up pretty sharp, and then it was deeper on the west side, as there was quite a little elevation on the west side of the track and you went down a pretty steep grade (indicating) on the west side of the track.

"Q. In your judgment. Mr. Babb, about how many feet would it be from the top of the track to the level of the ground at the west edge of the railroad right of way: that is, I mean, about how high perpendicularly? A. Well, I would judge between eight and ten feet; something like that. * * * Q. Do you know whether or not the dirt on the grade came right up to the edge of the boards on that crossing? A. Yes, sir. Q. Did it come up to the top surface of the boards? A. Well, I hardly think they did. I don't think it quite got up to the boards. * * * Q. I will ask you, referring to the grade on the east side, if it ran from the point of beginning to the edge of the railroad in a straight line up there, or did it curve downward? A. No. sir, it curved down kind of in a dip. Q. Now, state about the condition or the elevation of that fill about a foot east of the railroad. A. Well, a foot or 18 inches—something like that, as near as I could —it kind of dipped right down and then

sloped out. Q. Was that almost straight down? A. Well, it was tolerably steep there for just a couple or three feet. Q. And then it slopes up? A. Yes; just a kind of a dip—angle. Q. State the condition of the west side of the track. A. Well, it was more of a straight—but it pitched down (indicating)—it was deeper and farther down than where the road come in on the east side. Q. Now, the west side, Mr. Babb; was that steep? A. Pretty steep; yes, sir. Q. Mr. Babb, in your best judgment, do you think a fellow could drive over that crossing at the rate of 15 miles an hour and still be safe? A. No, sir,—he might make it over there, but he would be taking chances."

Cross-examination:

"Q. You think a man would be rather careless to undertake to go over that crossing at the rate of 15 miles an hour? A. If he was acquainted with it and knowed what he was going over, he would be. Q. Well, if he wasn't acquainted with it, shouldn't he be more careful about feeling his way over, especially at night? A. Well, yes, but then, coming from the east, it doesn't look bad. It doesn't look as bad—you are going right up, and the railroad is not, I don't believe, over three feet up, but then—that little curve in there shoots you right up. It is so steep and so far off on the other side you can't see over there—you don't know what you are going into. * * * Q. Now, what can you say as to the general condition of that crossing? You say you examined this crossing soon after the accident there, didn't you? A. Well, not particularly examined it. I crossed over it every few days. Q. What was the general condition of the crossing at that time? A. Well, just like it has been for years. It has never been a good crossing. It has been a very poor crossing—dangerous. * * *"

Re-direct examination:

"Q. Describe to the jury just what effect that crossing has on a vehicle crossing there at an ordinary rate of speed. A. Well, it is owing to what you would call an ordinary rate of speed. Q. Well, about 12 or 15 miles an hour—by a car coming from the east. A. Well, I would judge a feller driving 15 miles an hour, coming from the east—the railroad doesn't look so awful high, but just before you go up on to the track, you are liable to leave the ground entirely until you get ten feet from the track, going down over that hillside on the other side—it is so steep over there and such a long slope down there, and this little dip in there just shoots a car right up nearly clear of the railroad track. Q. I will ask you, Mr. Babb, if a car driving from the east with the lights on—if he could detect that steep incline just before going onto the railroad, that is, by looking? A. I hardly think he could because his lights would shine direct right into that—

it looks like it is just a gradual slope where it is a little dip in there."

Mrs. George Eccles: Lives at the south edge of Nowata; is acquainted with the crossing; that the road leading up to that crossing is fairly good, level road. It runs up close to the crossing, and then there is a steep incline up to the track. The boards on the east side of the track are there, but there is very little dirt up on those boards; it is just timbered there; and when you get across the tracks, you jump down off of this and right down on the steep grade on the west side of the road—of the track; that the dirt did not extend up to the top of the boards, but was about at the bottom of the boards. Witness says she has driven over the crossing many times and that the approach on the east side of the grade is just scooped up towards the crossing. Says that in crossing this intersection she drove as slowly as her car would go, and that she slowed up because it is dangerous to cross it fast.

Cross-examination:

"Q. About how thick were these boards on top of the crossing and between the rails and on the outside of the rails? A. I couldn't say just how thick they are, but it is quite a jolt when you go down off of those rails or up on them—off of those boards in a car. Q. Do you have any idea about how thick they are? A. Well, they must be about four inches. I wouldn't say positively that they are. * * * Q. It is not any steeper than necessary to get over the track, is it? A. Not—no, not any steeper than necessary to get over the track—unless it was graded back farther. Q. Well, the grade or fill starts back about the edge of the right of way fence, doesn't it—about even with it? A. I think not."

Lloyd Keller: Lives three miles south of Nowata; crosses the intersection frequently carrying butter and eggs into town; knew the crossing; says that it is tolerably steep, and that as you go up on the track, "why—the most of the time when I crossed it, there was a four-inch raise there to come up on the boards." The dirt was away from the sides of the rail.

"Q. On the east side? A. Well, on both sides. Q. The grades come up to the bottom of those boards? A. Yes, sir."

Charley Daugherty: Lives at Nowata; county commissioner; has always traveled that road since he has lived in Nowata; thinks he has crossed it as often as once each two weeks for ten years. The following questions and answers were given:

"Q. Just tell the condition of the east

fill. A. Well, the east fill is quite bad, but not as steep as the west. * * * It was what you would call a normal slope for that crossing, but the crossing was always—the railroad crossing was never filled in right where they had their boards across the track the way it should have been. There was always a bump to that crossing. Q. Well, was it filled up to the top surface of those boards, or was it at the bottom part of those boards? A. No, as I recall, I don't think they have ever been filled in below the bottom of the boards. * * * Q. And now about the condition of the west fill, Mr. Daugherty; could you describe the west fill? A. It was a steeper grade on the west side than that was on the east. Q. And was it filled up to the bottom surface of the roads (boards), or the top surface? A. As I recall it, they have always been about the same—both sides."

Cross-examination:

"Q. And didn't you tell me that it was good? A. I told you what was good? Q. The general condition of that crossing. Do you want to change that statement now? A. If I ever told that, I do, but I don't think I ever told it, because I never considered it good. Q. Well, I made a memorandum at that time as to the statements here—A. All right—* * * Q. And the fill, you say, did not come up flush with the boards? A. No, sir, it did not. Q. If that had been done, what would you say about it? A. If that had been done and filled up flush with the boards, it would have been as good a crossing as could be. Mr. Curtis: That is all. A. That is the weakness of the whole thing."

Re-direct examination:

"Q. When you say that it would have been a good crossing if it had been filled up flush with the boards, Mr. Daugherty, do you mean if it was filled up flush with the boards and then filled on back from the crossing? A. Yes. It was always too much of a grade, I would consider, especially on the west side."

Witness Ellon Steel, in describing the approach to the crossing, said: "It was just a quick, rapid rise, with about a four-inch rise when you hit the first board." It was a steep grade and was not straight. She testified further that she followed the tracks of the vehicle which overturned, and it left the track or road at a point about twice the length of the car from the railroad, and that it turned over about 75 or 100 feet from the railroad.

The foregoing testimony and other evidence of the same kind went in without objection. Defendant demurred to this evidence as insufficient. We are of the opinion that the court did not err in overruling such demurrer. Some of this evidence may be subject to the objection that it partakes of the nature of conclusions, but the parties seem to have made an effort to try the case upon its merits and very few objections were made to the form of answers and none to the testimony set out above. But aside from any objection to the evidence which might have been available to defendant, we are clearly of the opinion that there was ample evidence introduced which was subject to no objection or exceptions to properly carry the case to the jury, and we are convinced that the defendant has suffered no prejudice from the overruling of his demurrer.

2. "For errors occurring during the progress of the trial, to which the defendant at the time excepted and caused its exceptions to be noted of record."

Under this head we are referred to portions of the record as follows:

"Mrs. J. W. Steel (defendant in error) transcript 69: Q. 'State whether or not your condition was the result of the accident that occurred in crossing the Missouri Pacific Railroad at Nowata, Okla.? Defendant's counsel objects to the question as leading and suggestive. The Court: Objection overruled. Mr. Curtis: The defendant excepts. A. Yes, sir, it was; that was where I was hurt'."

This presents no reversible error in this case for the reason: First, that the permission of a leading and suggestive question is not usually reversible error. Ellison v. Beannabia, 4 Okla. 347, 46 Pac. 477; Purcell Cottonseed Oil Mills v. Bell, 7 Ind. Ter. 717, 104 S. W. 944; Smith v. Gillis, 51 Okla. 134, 151 Pac. 869. Second, from an examination of the record, we conclude that defendant was not thereby prejudiced.

Again, we are referred to the following record:

"Q. Do you know whether or not it was there about the 29th day of May, 1925? A. I know it was not there. * * *"

This refers to the stop signal. This is the only reference to stop signals in the entire evidence in the case, and moreover instruction No. 8 of the court specifically withdraws from the consideration of the jury in arriving at their verdict the fact as to whether or not the stop sign was there.

3. The next contention is based on the following record:

"Mr. Babb, I will hand you defendant's Exhibit B-10 (indicating and handing same to witness), which is a picture of that crossing, and I will ask you if that is a true and

correct picture of that crossing as it was on or before the 29th day of May, 1925? Mr. Curtis: That is objected to as being incompetent, irrelevant and immaterial, and no proper foundation has been laid. The Court: Objection overruled. Mr. Curtis: The defendant excepts. A. It doesn't hardly look like it, no, sir. Q. Would you say that (indicating) shows the true condition of that crossing as it existed at that time? A. No, sir."

The same witness is asked similar questions about other photographs introduced by defendant, and is allowed to explain why the photographs do not reflect conditions existing at the time of the injury.

"Q. Does that show the true condition of that side of the fill as it existed at the date in question? A. No, sir, it doesn't show it like it really is. It doesn't show the grade right at the crossing as it was at that time. That looks like—nearly like a natural grade from 'here (indicating) to the—to the top of the railroad, which it was not."

Defendant claims that no proper foundation had been laid for the criticism of such photographs by Babb; that he was not qualified as an expert. Mr. Babb was a licensed civil engineer and had been county surveyor since statehood and had made numerous similar surveys. These photographs purported to show the lay of the land, shape of the road, the amount of grade, and other matters surrounding the crossing in question. Defendant was permitted to show by his witness that these photographs were actually taken and were correct and represented conditions as they existed a few days after the accident. We think it must follow that if the photographs were taken at an angle which would not disclose the true facts, or if they were taken in such position as to minimize the grade which was not only testified to, but appears entirely plausible, it would seem strange that an expert in such matters who had been acquainted with the particular crossing for years would not be permitted to say that a particular photograph did not reflect the actual situation at that point and at that time. The cases cited in support of defendant's contention are not controlling, but the following references indicate the proper rule: 10 R. C. L. par. 361, p. 1160:

"They (photographs) stand, so far as their credibility as evidence is concerned, upon the same basis as do maps or diagrams. Their correction is not irrefutable." And cases cited in note 17.

4. "Because the verdict of the jury is excessive and is not supported by the evidence, and appears to have been rendered as a result of bias and prejudice of the jury."

If plaintiff's evidence is to be believed she received permanent, painful and serious injuries to the lower part of her spine which have substantially affected her health, and we cannot view a recovery of $1,800 for an injury resulting in four months' practical confinement and a serious loss of working power as any sort of indication that the jury was moved by either prejudice or passion, or was moved by any consideration other than to fairly compensate for the injury sustained.

5. "The court erred in giving * * *instructions Nos. 4, 5 and 10, to the giving of which the defendant at the time excepted, and caused its exceptions to be noted of record."

No. 4 is as follows:

"You are instructed that if you find for the plaintiff and find that the plaintiff's injury is objective, and it is apparent from the nature of the injury, that the plaintiff must of necessity undergo pain and suffering in the future, that you may infer that fact from proof of such injury alone."

No. 5 is as follows:

"You are further instructed that where the injury is subjective and it is not apparent, then to warrant you to return a verdict for future pain and suffering, there must be produced evidence by expert testimony that the plaintiff with reasonable certainty will experience future pain and suffering as a result of the injury."

No. 10 is as follows:

"You are instructed that in assessing the damages of the plaintiff, if any you find her entitled to, the law does not furnish any exact rule for your guidance, but must be left to the good judgment and sound discretion of the jury under all the evidence in the case. You may take into consideration the extent of the plaintiff's injuries, if any, her physical and mental pain, if any, the suffering which she has endured, if any, which was the natural and proximate result of such injury, the pain and suffering which it is reasonable to infer that she will suffer in the future as a natural and proximate result of such injuries, if any, and allow her such an amount as damages as you may find she is entitled to recover, if any, not to exceed the sum of $2,999."

The objection to No. 4 is that there was no evidence indicating an injury that would fall under its definition. From this record we are convinced that, even if there were no such evidence (and we do not decide the point), this instruction would not be reversible error. The verdict is not excessive, and we think it was not based upon future suffering—the amount of it would negative the idea. Oklahoma Union Ry. Co. v. Lynch, 115

Okla. 146, 242 Pac. 176; Muskogee Elec. Tr. Co. v. Richards, 97 Okla. 61, 222 Pac. 265.

As to No. 5, the objection is that there was no evidence that plaintiff's injuries were permanent. This contention is unsound. There is evidence from which the jury might conclude that the injuries were of a permanent nature. In fact, one of the medical witnesses testified that the condition of the spine was worse than it was six months prior to the date of trial.

The objection to No. 10 is that it emphasizes the amount of damages claimed. This contention is clearly without merit.

And finally, the defendant complains at the refusal of the court to give special instructions requested, Nos. 1, 2, 3 and 5. In his brief he does not set out No. 1, which appears to have been an application for a directed verdict, and we have dealt with this under the holding that plaintiff's evidence was sufficient to be passed upon by a jury. Nos. 2 and 3 are given in substance. So much of special instruction No. 5, as was not given verbatim in the instructions of the court, was, we think, given in substance in the general instructions.

We have read the entire record, and we are of the opinion that the issues were fully and fairly presented by the instructions to the jury, and that there appears no reversible error.

Defendant demurred to the evidence of plaintiff when she rested, and also at the close of all the evidence, and also moved at the latter time for an instructed verdict in its favor; and in brief an oral argument insists as the chief ground of its complaint that the evidence is insufficient to support the verdict and judgment. Upon a law question tried to a jury, if there is any evidence reasonably tending to support the verdict, it will not be disturbed. Spring v. Major. 126 Okla. 150, 259 Pac. 125; Stockwell v. Gee, 121 Okla. 207, 249 Pac. 389; C., R. I. & P. Ry. Co. v. Hurst, 129 Okla. 1, 263 Pac. 113.

We are of the opinion, and so hold, that there was evidence reasonably tending to support the verdict and judgment, and that there is no substantial error in the record. The judgment of the trial court should be and the same is affirmed.

HERR, DIFFENDAFFER, JEFFREY, and FOSTER, Commissioners, concur. HALL, Commissioner, dissents.

By the Court: It is so ordered.

Note.—See under (1) 26 R. C. L. p. 1062; 3 R. C. L. Supp. p. 1490; 4 R. C. L. Supp. p. 1694; 6 R. C. L. Supp. p. 1581; 7 R. C. L. Supp. p. 911. (3) 28 R. C. L. p. 590; 5 R. C. L. Supp. p. 1546; 6 R. C. L. Supp. p. 1734. (4) anno. 35 L. R. A. 802; 51 L. R. A. (N. S.) 1160; 10 R. C. L. p. 1160; R. C. L. Perm. Supp. p. 2839. See "Appeal and Error," 4 C. J. §2950, p. 967, n. 17; §2977, p. 995, n. 62. "Damages," 17 C. J. §365, p. 1064, n. 1. "Evidence," 22 C. J. §1124, p. 919, n. 80. "Trial," 38 Cyc. p. 1548, n. 27; p. 1578, n. 39. "Witnesses," 40 Cyc. p. 2427, n. 26.